In the

# United States Court of Appeals
## For the Seventh Circuit

_____

Nos. 22-2636, 22-2630, 22-2632, 22-2633, 22-2634, 22-2635, & 22-2637

LATONYA CANNON, *et al.*,

*Plaintiffs-Appellants*,

*v.*

ARMSTRONG CONTAINERS INC., *et al.*,

*Defendants-Appellees*.

_____

Appeals from the United States District Court for the
Eastern District of Wisconsin.
Nos. 07-c-0864, 11-c-0055, 11-c-0425, 14-c-1423 — **Lynn Adelman**, *Judge*.

_____

ARGUED SEPTEMBER 26, 2023 — DECIDED FEBRUARY 9, 2024

_____

Before WOOD, SCUDDER, and ST. EVE, *Circuit Judges*.

ST. EVE, *Circuit Judge*. This is a successive appeal of a series of toxic tort cases brought by individuals allegedly harmed by lead paint pigment. The cases include the claims of approximately 170 different plaintiffs, most of whom are joined together in a single complaint. All the plaintiffs and all the cases proceeded together in the same court, in front of the same

judge, and against the same lead paint manufacturers. The same counsel represented each plaintiff.

To bring order to this sprawling array of litigants, the parties and the district court devised a case management plan under which groups of plaintiffs would try their claims in a series of waves. The plaintiffs in the first two waves, however, met a concatenation of defeats here and in the district court, resulting in the district court granting summary judgment for the defendants on all claims. The court then extended those rulings to the remaining 150+ plaintiffs on law of the case and issue preclusion grounds.

After careful review, we see no error in much of the court's reasoning. Most of these plaintiffs opted to proceed under a single complaint, within a single case, which is now sunk after summary judgment. But a small group of plaintiffs filed their own cases, and due process protects their right to try them. For the reasons that follow, we affirm the decision of the district court in large part and reverse in small part.

## I. Background

This mass tort case involves approximately 170 plaintiffs, spread over several actions, all alleging injuries stemming from their exposure to white lead carbonate ("WLC"), a lead-paint pigment. Each plaintiff contends he was exposed to WLC as a child during the 1990s and early 2000s, while growing up in Milwaukee homes that had lead-based paint on the walls. Each seeks to hold several manufacturers of WLC (and their successors) liable under state-law negligence and strict liability theories.

Nos. 22-2636 *et al.*                                            3

## A. Legal Background

We begin with a brief overview of the legal framework that supports the plaintiffs' claims, which we addressed in detail in our prior opinion. *See Burton v. E.I. du Pont de Nemours & Co.*, 994 F.3d 791 (7th Cir. 2021) ("*Burton II*"). In short, this case is a kind of anachronism. For a brief moment, Wisconsin law recognized a cause of action for WLC injuries based on a "risk-contribution" theory. *See Thomas ex rel. Gramling v. Mallett*, 701 N.W.2d 523 (Wis. 2005). That theory, blessed for purposes of WLC litigation by the Wisconsin Supreme Court in 2005, essentially permitted plaintiffs to bring injury claims even if they could not prove exactly who manufactured the WLC that injured them. *Id.*; *see also Burton II*, 994 F.3d at 804–05. As we explained in *Burton II*: risk contribution "modifies the ordinary rule in tort law that a plaintiff must prove that a specific defendant's conduct caused his injury … by apportion[ing] liability among the 'pool of defendants' who could have caused the injury." 994 F.3d at 802. Wisconsin recognized such claims until 2011, when the Wisconsin legislature effectively overruled *Thomas*. *See id.* at 806; Wis. Stat. § 895.046. The Wisconsin legislature also attempted to make its statute retroactive, but we rejected that effort after finding that retroactivity would violate the state's due process guarantees. *See Gibson v. Am. Cyanamid Co.*, 760 F.3d 600 (7th Cir. 2014). The result? From 2005 to 2011, WLC claims based on a risk-contribution theory were viable, and approximately 170 plaintiffs entered the courthouse door. *Burton II*, 994 F.3d at 807.

**B. Procedural Background**

    **1. The Cases**

These cases began in 2007, after Glenn Burton, Jr., filed a complaint in Wisconsin state court against eight manufacturers of WLC. The defendants removed the case to federal court. Meanwhile, two more lawsuits, filed by Ravon Owens and Ernest Gibson, were similarly removed to federal court.

More cases followed. In early 2010, Cesar Sifuentes filed a case directly in federal court. A year later, over 160 different individuals filed a single complaint under Federal Rule of Civil Procedure 20(a)(1), with Maniya Allen as the first-named plaintiff. Not long after, Deziree and Detareion Valoe jointly filed suit. Finally, three plaintiffs from the *Allen* action—Dijonae, Ty'Jai, and Jaquan Trammell—agreed to sever their claims into a separate suit to cure a diversity problem. Those plaintiffs also proceeded under a single complaint.

The cases eventually proceeded against American Cyanamid Co.; E.I. du Pont de Nemours and Company, Inc.[1]; NL Industries, Inc.; the Sherwin Williams Company; Armstrong Containers, Inc.; and the Atlantic Richfield Company. Judge Adelman ultimately presided over each case, and the same counsel represented each plaintiff. These separate cases, however, were never formally consolidated under Federal Rule of Civil Procedure 42(a).[2]

---

[1] E.I. du Pont de Nemours and Co. now goes by the name "EIDP, Inc."

[2] Partial consolidation did occur at several points, largely because the *Gibson* action proceeded in front of another judge before its eventual reassignment to Judge Adelman. The plaintiffs successfully moved to partially

Early on, the defendants jointly moved to dismiss or sever all but the named plaintiff in the *Allen* case (which, recall, included approximately 160 individuals). The defendants argued that the *Allen* action improperly joined those plaintiffs because they lived in separate cities and alleged separate injuries incurred at separate times—all of which required individualized discovery and separate trials. The plaintiffs countered that joinder was proper because the claims involved "numerous" common questions of law or fact. Specifically, the plaintiffs argued that discovery on general causation would be "similar, if not identical" for every plaintiff, and that common issues included whether the defendants "knew of the hazards inherent in the white lead paint products at issue when they marketed them to the general public in Wisconsin." "Proof of the failure to warn elements," according to the plaintiffs, was "particularly conducive to this common discovery."

The district court agreed and denied the defendants' motion to sever. The court reasoned that the *Allen* plaintiffs' claims were sufficiently connected because their injuries stemmed from a common source—the defendants' manufacturing of lead-based paint—and because their claims presented common questions of liability under a common theory—risk contribution. While the court recognized that "individual discovery and separate trials will likely be required," the court noted that it could accomplish both tasks "without

---

consolidate their cases under Rule 42(a) to settle their claims against a single defendant, NL Industries, Inc.; to determine the defendants' motions to dismiss for lack of personal jurisdiction; and to decide motions for a protective order.

the disadvantages attendant to dismissal or severance." The *Allen* plaintiffs thus continued under the single complaint.

### 2. The Case Management Order

All the plaintiffs jointly proposed a case management order ("CMO") that would sequence proceedings in piecemeal fashion. Under the plaintiffs' proposal, the parties would conduct a limited number of "bellwether" trials, comprising "select," "representative" cases. The plaintiffs intended the CMO to streamline the litigation by "allow[ing] for coordinated motion practice on issues present in all of the cases." There were "clearly some threshold legal issues that will, of course, apply to all cases." Such issues, the plaintiffs urged, "should be dealt with once, not on a case-by-case basis."

Over the defendants' objection, the court largely adopted the plaintiffs' proposal and entered a CMO under which trials and discovery would proceed in a series of "waves." Under the CMO, several of the oldest cases—*Burton*, *Owens*, and *Sifuentes*—would proceed to trial first. We refer to these cases as "Wave 1."

Next, the CMO instructed the parties to prepare eight additional cases for trial concurrently with the Wave 1 proceedings. From those eight cases, the parties had to select four for trial (two each) after extensive discovery and motion practice. The CMO did not identify specific plaintiffs to be included in that wave, nor did it refer to the cases as "bellwethers." The parties ultimately selected three of the *Allen* plaintiffs (Latoya Cannon, D'Angelo Thompson, and Tyann McHenry), and one of the *Trammell* plaintiffs (Dijonae Trammell). We call these four trial plaintiffs "Wave 2."

### 3. Wave 1 Summary Judgment and Trial

Ahead of trial in the Wave 1 cases, the defendants filed motions for summary judgment on the plaintiffs' negligence and strict liability claims. Underpinning the defendants' summary judgment arguments was the premise that the duty to warn—a required element of both claims—was identical in the negligence and strict liability contexts. The district court found otherwise, and distinguished the duty to warn in the negligence context from the duty to warn in the strict liability context. *See Burton v. Am. Cyanamid*, 334 F. Supp. 3d 949, 961–67 (E.D. Wis. 2018). The court held that in the negligence context, the duty to warn turned on what the consumer knew at the time he or she was exposed to WLC—in this case the 1990s or early 2000s. *Id.* at 961. But in the strict liability context, according to the district court, that duty turned on what the ordinary consumer knew at the time the defendants produced WLC—which was much earlier, sometime between 1910 and 1947. *Id.* at 962.

The different duties meant different fates for the negligence and strict liability claims. The court granted summary judgment for the defendants on the negligent failure-to-warn claims. The evidence showed that paint manufactures had been issuing warnings to consumers since 1955, and that by the 1990s, caregivers were well aware that lead-based paint was dangerous. *Id.* at 961. Thus, the court reasoned, the plaintiffs or their caregivers needed no further warning about the dangers of lead dust. The plaintiffs never appealed this negligence ruling.

In contrast, the strict liability claims survived. The court found that a jury could conclude that between 1910 and 1947 the public was not fully informed about the dangers of lead-

based paint, giving rise to a genuine issue of material fact as to whether the defendants had a duty to warn consumers who purchased paint during those years. *Id.* at 962–63.

The Wave 1 plaintiffs proceeded to trial on those surviving claims. At the close of evidence, Judge Adelman dismissed American Cyanamid from the case for lack of personal jurisdiction. *See Burton II*, 994 F.3d at 811. The jury ultimately found DuPont, Sherwin Williams, and Armstrong liable, and awarded $2 million in damages to each plaintiff. *Id.* The jury found Atlantic Richfield not liable. *Id.* The losing defendants appealed.

Before turning to that appeal, we note that American Cyanamid and Atlantic Richfield sought to use their respective victories at the Wave 1 trial to exit the litigation entirely, meeting mixed results. American Cyanamid—having won dismissal in Wave 1 for lack of personal jurisdiction—moved for dismissal from the remaining cases on issue preclusion grounds. The district court granted that motion, reasoning that issue preclusion was appropriate because of the plaintiffs' shared counsel, tightly coordinated litigation strategy, and extensive opportunities to make their jurisdictional case.

Defendant Atlantic Richfield—whom the jury had found not liable—similarly invoked issue preclusion, but it did not escape so easily. The court denied Atlantic Richfield's motion, noting that the plaintiffs might handle future trials with greater care, and with better evidence. "In mass-tort cases like these," the court reasoned, "courts recognize that the parties' evidentiary treatment of the issues is likely to become more focused and thorough with reiteration, and therefore hesitate to apply issue preclusion after only one or two trials."

### 4. Summary Judgment in the Remaining Cases

While their Wave 1 appeal was pending, the defendants moved for summary judgment against the Wave 2 plaintiffs. The defendants seized on the court's ruling on the negligent failure-to-warn claims in the Wave 1 cases to argue that the court should similarly grant summary judgment in their favor in Wave 2. In response, the Wave 2 plaintiffs raised the white flag. They surrendered their negligence claims in a footnote, which read:

> Sherwin-Williams initially argues that Plaintiffs have no claim for negligent failure to warn. *Well aware of this Court's previous order, Plaintiffs concede that they do not have surviving claims for negligent failure to warn.*

The court granted summary judgment against the Wave 2 plaintiffs on their negligent failure-to-warn claims. *See Allen v. Am. Cyanamid*, 527 F. Supp. 3d 982, 996–97 (E.D. Wis. 2021). But, as with Wave 1, the court permitted the Wave 2 plaintiffs to proceed to trial on their strict liability claims. *Id.* at 995–96.

### 5. The Wave 1 Appeal (*Burton II*)

Then came this court's decision in the defendants' Wave 1 appeal. *See Burton II*, 994 F.3d 791. Most relevant here, we rejected the district court's finding that the duty to warn in the strict liability context differs from that in the negligence context. We concluded that the duty to warn in both types of claims "depend[s] on what the ultimate consumer (i.e., the plaintiffs or their caregivers) knew, rather than what consumers in general knew at the time the manufacturer released the product into the market." *Id.* at 823.

Our conclusion that the duties for both claims were identical led to a two-front victory for the defendants. First, we

held that the court legally erred in finding that the defendants had a duty to warn for purposes of strict liability, since it had already ruled that they had no duty to warn on their negligence claims. *Id.* Second, and because the plaintiffs had not cross-appealed the court's ruling on their negligence-based claims, our holding compelled judgment as a matter of law for the defendants on the strict liability claims. *Id.*

### 6. Renewed Summary Judgment and Reconsideration Motions

Following *Burton II*, the remaining defendants filed renewed motions for summary judgment—this time against *all* the plaintiffs in all seven cases.[3] As to Wave 2, the defendants argued that *Burton II* compelled summary judgment on the strict liability claims since the district court had already granted summary judgment against the plaintiffs on the negligence-based claims. That is, because the duties were identical, and because the district court had found there was no duty to warn consumers in the 1990s and early 2000s about the dangers of lead paint, that finding doomed both claims.

The defendants also sought summary judgment as to the remaining plaintiffs. To best understand each argument, it helps to further subdivide those remaining plaintiffs because they are situated differently.

The first group of plaintiffs consists of the remaining plaintiffs from the *Allen* and *Trammell* actions who did not participate in Wave 2. We refer to this batch of *Allen* and *Trammell* plaintiffs—the non-Wave 2 contingent—as "Group 3."

---

[3] The Wave 1 plaintiffs are not parties to this appeal.

The second group of plaintiffs consists of those from the *Gibson* and *Valoe* actions. These plaintiffs, unlike Group 3, come from cases with no representative in the litigation thus far. We call these plaintiffs "Group 4."

The defendants sought summary judgment against the Group 3 plaintiffs on law of the case grounds, arguing that they came from the same "case" as the Wave 2 plaintiffs and so the court's duty-to-warn determination applied with equal force. As to the Group 4 plaintiffs, the defendants argued that issue preclusion applied because duty to warn was a common issue that the earlier waves of plaintiffs had fully litigated.

All plaintiffs objected to the motions. Additionally, the Wave 2 plaintiffs asked the court to reconsider its earlier negligence-based duty determination.[4] The motion for reconsideration introduced new evidence and a new theory of duty arising from a previously unmentioned threat posed by WLC: that of lead dust—invisible particles of lead derived from the breakdown of lead paint, paint chips, and other lead-based products. The plaintiffs' new evidence purported to show that, although modern consumers may have been aware of some of the dangers of lead-based paint, they were not so aware of the specific dangers of lead dust. This lack of awareness about lead dust, the plaintiffs argued, could give rise to a duty to warn that would salvage their negligence claim.

The district court denied the Wave 2 plaintiffs' motion to reconsider on several grounds. First, the Wave 2 plaintiffs had previously conceded their negligence claims during the initial

---

[4] The plaintiffs requested reconsideration under Rule 54(b) or "any other Rule or theory deemed appropriate."

summary judgment round without pointing to any counter-vailing evidence. Second, the countervailing evidence that the Wave 2 plaintiffs had since produced did not qualify as "new" for purposes of reconsideration because it was available all along. The court determined that the plaintiffs were "well equipped to argue" during the initial summary judgment round that the defendants had a duty to warn consumers about lead dust, but instead "made a strategic choice" to forgo their negligence claims.

As to Group 3, the district court found that the law of the case doctrine properly applied. The court reasoned that while the *Allen* and *Trammell* plaintiffs each had their own claims, they elected to join those claims in the *Allen* and *Trammell* actions. They were thus formally parties to those two cases. Moreover, the court reasoned, it was fair to bind Group 3 to its Wave 2 rulings because those rulings concerned a common question of law or fact: whether the defendants had a duty to warn consumers in the 1990s and early 2000s. Allowing Group 3 to separately relitigate the common issue "would destroy the efficiency that provided the justification for joinder in the first place." The court further determined that none of the exceptions to the law of the case doctrine applied.

As to Group 4, the district court found that collateral estoppel principles precluded the Group 4 plaintiffs from relitigating the duty-to-warn issue. Applying Wisconsin preclusion law, the court reasoned that the duty-to-warn question was adequately litigated, and that the Group 4 plaintiffs were sufficiently in "privity" with the prior plaintiffs. The court held that the Group 4 plaintiffs had an "obvious interest" in the earlier waves because "the plaintiffs were prosecuting claims against the same defendants under identical legal

theories in front of the same court and the same judge, who had been managing all cases jointly." The court also noted that the same counsel represented the Group 4, Wave 1, and Wave 2 plaintiffs, which suggested that the Group 4 plaintiffs "approved of the tactics and strategy employed in the prior action." Last, the court pointed out that it previously had applied issue preclusion against these same plaintiffs in determining that it lacked personal jurisdiction over American Cyanamid.

In the end, the district court granted the defendants' summary judgment motion on all claims. The district court denied the plaintiffs' motion to alter or amend its judgment under Rule 59(e). It added, however, that to the extent the law of the case doctrine did not apply to Group 3, it would reach the same result on issue preclusion grounds.

## II. Analysis

The three remaining batches of plaintiffs—Wave 2, Group 3, and Group 4—each appeal the district court's grant of summary judgment against them. The Wave 2 plaintiffs contend that the district court erred in denying their motion to reconsider. The Group 3 plaintiffs maintain that the law of the case doctrine does not apply to them. And the Group 4 plaintiffs argue that applying issue preclusion against them violates due process. Additionally, all plaintiffs think we got questions of Wisconsin state law wrong the first time around, *see Burton II*, 994 F.3d at 817–25, and they ask us to revisit that decision or certify the questions to the Wisconsin Supreme Court. We take each argument in turn.

### A. Wave 2 Plaintiffs

We begin with the Wave 2 plaintiffs, who argue that the district court erred in rejecting their motion to reconsider. As noted above, the centerpiece of that motion is "new" evidence regarding lead dust, which purports to show that, although modern consumers might have been aware of the dangers of lead paint, they were not so alert to the threats of lead dust. We review the district court's decision to deny a motion for reconsideration for an abuse of discretion. *See KAP Holdings, LLC v. Mar-Cone Appliance Parts Co.*, 55 F.4th 517, 528 (7th Cir. 2022).

We have said many times before that "[a] party may not use a motion for reconsideration to introduce new evidence that could have been presented earlier." *Cincinnati Life Ins. Co. v. Beyrer*, 722 F.3d 939, 956 (7th Cir. 2013) (quoting *Oto v. Metro Life Ins. Co.*, 224 F.3d 601, 606 (7th Cir. 2000)); *see also Caisse Nationale de Credit Agricole v. CBI Indus., Inc.*, 90 F.3d 1264, 1269 (7th Cir. 1996) ("Such motions cannot … be employed as a vehicle to introduce new evidence that could have been adduced during the pendency of the summary judgment motion." (quotation marks omitted)). Rather, "[a] party seeking to defeat a motion for summary judgment is required to wheel out all its artillery to defeat it." *Caisse Nationale*, 90 F.3d at 1270 (quotation marks omitted). Evidence kept in reserve, whether through strategy or inadvertence, supplies no basis for reconsideration. *See id.*

The lead dust evidence undeniably falls into the category of preexisting-but-newly-desirable evidence. As the district court recognized, this evidence was available to the Wave 2 plaintiffs when they opted to concede their negligence claims at summary judgment. It is therefore inert on reconsideration.

Nos. 22-2636 *et al.*                                          15

Rather than argue otherwise, the plaintiffs primarily contend that the district court should have granted their motion for reconsideration because the legal landscape shifted after our decision in *Burton II*. They insist that this court "changed the rules" when it held that strict liability and negligent failure-to-warn claims shared the same duty standard, and that the court should therefore permit them to relitigate the negligence-based claims.

While it is true that motions for reconsideration may be appropriate where there has been a "controlling or significant change in the law," *Bank of Waunakee v. Rochester Cheese Sales, Inc.*, 906 F.2d 1185, 1191 (7th Cir. 1990) (citation omitted), no such change occurred here. *Burton II* had everything to do with strict liability and nothing to do with negligence. Our ruling affected only what the defendants had appealed: the district court's determination of the duty to warn for *strict liability* claims. *Burton II*, 994 F.3d at 821–23. We did not disturb the district court's ruling on the plaintiffs' negligence-based claims. Indeed, we even noted that the negligence claims were not under consideration because the plaintiffs "ha[d] not appealed" them. *Id.* at 823. *Burton II* therefore cannot support a motion to reconsider the court's negligence ruling.[5]

---

[5] We add that *Burton II* did not work any "change in the law" that would trigger the exception to the law of the case doctrine. The district court's duty determination in the strict liability context is not a precedent and established no law that we could have altered in *Burton II*. *See Midlock v. Apple Vacations W., Inc.*, 406 F.3d 453, 457 (7th Cir. 2005) ("[A] district court decision does not have stare decisis effect; it is not a precedent."); *United States v. Arterbury*, 961 F.3d 1095, 1105 (10th Cir. 2020) (rejecting the premise that "a district court can set the 'law' for change-of-law

We recognize that the Wave 2 plaintiffs may have conceded summary judgment to the defendants and elected not to appeal the district court's ruling on their negligent failure-to-warn claims because they thought they would succeed on their strict liability claims. While that may have seemed a sound strategic decision at the time, the fact that our ruling in *Burton II* proved that decision costly does not provide grounds for reconsideration. *See Caisse*, 90 F.3d at 1270; *see also Fannon v. Guidant Corp.*, 583 F.3d 995, 1003 (7th Cir. 2009) (finding no abuse of discretion where the plaintiffs "apparently made a strategic decision not to put their new evidence into the record"). The district court did not abuse its discretion in denying the Wave 2 plaintiffs' motion for reconsideration.

**B. Group 3 Plaintiffs**

We turn next to the Group 3 plaintiffs—the remaining, non-Wave 2 plaintiffs from the *Allen* and *Trammell* actions. The district court granted summary judgment against Group 3 on law of the case grounds.[6] For the reasons that follow, we find no error in that decision.

---

purposes"). Moreover, *Burton II* did not change Wisconsin law but rather applied established Wisconsin law principles. *See Burton II*, 994 F.3d at 822 ("[W]e and other courts applying Wisconsin law have treated [the duty to warn for negligence and strict liability claims] as materially identical."); *cf. Arterbury*, 961 F.3d at 1105 (concluding that "appl[ying] long-established" principles does not "change the law").

[6] The district court alternatively held that issue preclusion would apply to the Group 3 plaintiffs. Because we affirm the district court's decision on law of the case grounds, we do not reach that alternative holding.

"The doctrine of law of the case establishes a presumption that a ruling made at one stage of a lawsuit will be adhered to throughout the suit." *Avitia v. Metro. Club of Chi., Inc.*, 49 F.3d 1219, 1227 (7th Cir. 1995) (citations omitted). The doctrine is discretionary, "not an inflexible dictate." *Chi. Joe's Tea Room, LLC v. Village of Broadview*, 894 F.3d 807, 818 (7th Cir. 2018) (citations omitted)); *see also Peterson v. Lindner*, 765 F.2d 698, 704 (7th Cir. 1985) ("[Law of the case] must yield to rational decisionmaking." (citing 20 A.L.R. Fed. 13 (1974)); *Avitia*, 49 F.3d at 1227 ("But [law of the case] is no more than a presumption, one whose strength varies with the circumstances; it is not a straitjacket." (citation omitted)). Generally, however, a party must point to a "good reason" to abandon the court's earlier ruling. *Tice v. Am. Airlines, Inc.*, 373 F.3d 851, 853 (7th Cir. 2004); *see also* 18B Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 4478 (3d ed. Apr. 2023 Update) (hereinafter "Wright & Miller") ("The standards announced for departing from the law of the case commonly demand strong justification."). Such "unusual circumstances" justifying departure from the doctrine include (1) substantial new evidence introduced after the first review, (2) an intervening change in the law, and (3) a clearly erroneous decision. *See Kathrein v. City of Evanston*, 752 F.3d 680, 685 (7th Cir. 2014) (quotation marks omitted).

Here, the law of the case doctrine properly applies to the Group 3 plaintiffs because they were part of the same "case" as the Wave 2 plaintiffs and have consistently litigated that way. *See Jarrard, v. CDI Telecomms., Inc.*, 408 F.3d 905, 911–12 (7th Cir. 2005) ("[A]s most commonly defined, the [law of the case] doctrine … posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages *in the same case*." (quoting

*Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 815–16 (1988)). All the plaintiffs in the *Allen* and *Trammell* actions—Wave 2 included—intentionally decided to join together under Rule 20 and proceed within those two complaints. Thus, when the Wave 2 plaintiffs conceded their negligence claims at summary judgment, that concession on a common issue bound the Group 3 plaintiffs. As the district court correctly noted: the Group 3 plaintiffs may have their own *claims*, but they chose to bring those claims within the *cases* of *Allen* and *Trammell*. The district court's ruling on the common duty question therefore became law of the case that appropriately applied to the Group 3 plaintiffs. *See Bell v. Publix Super Markets, Inc.*, 982 F.3d 468, 489 (7th Cir. 2020) (noting that "courts and parties may choose to manage [their] cases"—such as through consolidated complaints—"in ways that can … give up the separate identities of the original suits" (citing *In re Refrigerant Compressors Antitrust Litig.*, 731 F.3d 586, 588 (6th Cir. 2013)).

The plaintiffs urge us to ignore the formal relationship between them because only some of them proceeded with discovery. Their theory is that, even if the Group 3 plaintiffs were *technically* parties to the same case as the Wave 2 plaintiffs, the district court's "bellwether" treatment of the Wave 2 plaintiffs *functionally* severed them from the *Allen* and *Trammell* complaints they came from. In essence, they contend the district court "effectively created two separate litigations" when it placed the Wave 2 plaintiffs on their own track to trial.

The plaintiffs correctly note that the law of the case doctrine does not apply to severed claims. *See Gaffney v. Riverboat Servs. of Ind., Inc.*, 451 F.3d 424, 441 (7th Cir. 2006) ("As a general matter, Rule 21 severance creates two discrete,

independent actions, which then proceed as separate suits for the purpose of finality and appealability."); Fed. R. Civ. P. 21. Moreover, we have held that Rule 21 severance can occur in the absence of a "formal order." *See Rice v. Sunrise Express, Inc.*, 209 F.3d 1008, 1014 n.8 (7th Cir. 2000). In *Hebel v. Ebersole*, for example, we recognized severance despite the court's failure to formally invoke Rule 21. 543 F.2d 14 (7th Cir. 1976). It was enough there that the district court used the term "severed" in a pretrial order and had issued a judgment as to one of claims. *Id.* at 17. And in *Rice v. Sunrise Express*, we found severance even where the district court did not issue an order, invoke Rule 21, or use the word "sever" at all. 209 F.3d at 1013–16 & n.8. Severance is effective, we held, so long as "the evidence shows that the district court intended to sever the parties and the parties understood that severance had occurred." *Rice*, 209 F.3d at 1014 n.8; *cf. Ravenswood Inv. Co., L.P. v. Avalon Corr. Servs.*, 651 F.3d 1219, 1223–24 (10th Cir. 2011) (construing a district court order that "severed and retained *herein*" three separate claims as not severing the case, but rather retaining the claims "in the single, original case").[7]

---

[7] The plaintiffs cite neither *Hebel* nor *Rice* in support of their functional severance argument, and instead rely on a Sixth Circuit case, *Edmonds v. Smith*, 922 F.3d 737 (6th Cir. 2019). *Edmonds*, a habeas case involving the separate habeas petitions of two co-defendants, is an inapt comparator that does not even reference severance. *Id.* at 738–39. It simply stands for the unremarkable proposition that "different habeas actions brought by different petitioners are different cases." *Id.* at 739.

Here, however, there is no indication that either the district court or the parties intended severance to occur. There is also no evidence that the parties understood otherwise.

We start with the district court. The plaintiffs primarily argue that, despite the CMO's silence on the legal basis for setting aside the Wave 2 plaintiffs for trial, "it is clear that the court's action was analogous to severance under Rule 21." The CMO reveals no such intent on the part of the district court. The only meaningful evidence is the court's use of the word "cases"—rather than "claims"—in the CMO to describe the Wave 2 plaintiffs. But we do not find that characterization dispositive in the context of the history of this litigation, which shows that the court was committed to keeping the plaintiffs under one action, as they requested. Indeed, in response to the defendants' motion to sever the *Allen* plaintiffs' claims, the plaintiffs themselves described "[p]roof of the failure to warn elements" as being "particularly conducive" to common resolution. Thus, when the court expressly rejected the defendants' motion to sever, it was defending the plaintiffs' choice to collectively litigate the common questions of law and fact that permitted joinder in the first place. We therefore do not construe the CMO as showing any intent to separate the *Allen* and *Trammell* actions, and neither did the district court.

The plaintiffs also point out that the district court stayed discovery in the Group 3 cases, and the Wave 2 plaintiffs advanced toward a separate trial (from which a separate appeal presumably would have followed). None of this is determinative of severance. The district court just as easily could have held separate trials in the Wave 2 cases under Rule 42(b) and entered judgment under Rule 54(b), which permits the court

Nos. 22-2636 *et al.*               21

to enter "a final judgment as to one or more, but fewer than all, claims or parties" in an action. *See* Fed. R. Civ. P. 54(b); Fed. R. Civ. P. 42(b); *Gaffney*, 451 F.3d at 442 n.18 ("[A]n order of separate trials [under Rule 42(b)] does not result in the filing of separate cases. Instead, it simply leads to two or more separate factual inquiries in the context of a single, properly joined case. No matter how many separate trials the court may order, they remain part of a single case." (quoting 4 Moore's Fed. Practice § 21.06 (2005)). Similarly, Rule 42(b) also permits the court to stay discovery issues or claims within a single case. *See Ellingson Timber Co. v. Great N. Ry. Co.*, 424 F.2d 497, 499 (9th Cir. 1970) ("It is implicit [under Rule 42(b)] that the court also ha[s] power to limit discovery to the segregated issues." (citations omitted)). And while the court acknowledged that "individual discovery and separate trials will likely be required," in the same breath it made clear that "these things can be accomplished *without the disadvantages attendant to dismissal or severance.*"

Several more points bear mention. First, the court did not create new case captions or case numbers for the Wave 2 plaintiffs' claims, and instead continued to issue its rulings in the Wave 2 litigation—including its order granting summary judgment to the defendants on the negligent failure-to-warn claims—under the captions of the *Allen* and *Trammell* actions. Second, the court did not issue a separate judgment against the Wave 2 plaintiffs when it entered final judgment in this case. Finally, we find it telling that the capable district court at no point described the Wave 2 plaintiffs as having been "severed" from their Group 3 counterparts. *See Hebel*, 543 F.2d at 17. Quite the opposite. In its ruling, the district court rejected Group 3's severance theory as "clearly incorrect" and insisted that the Wave 2 plaintiffs were at all times proceeding

within the *Allen* and *Trammell* actions. Although that kind of Monday-morning characterization is not dispositive and could not erase a severance that had otherwise taken place, *see Gaffney*, 451 F.3d at 442, "[w]hen a United States District Judge states what occurred in his or her courtroom on a particular occasion, that statement is certainly worthy of [this court's] acceptance." *Rice*, 209 F.3d at 1015.

Our conclusion that the district court did not intend to sever the actions is also consistent with the conduct of both parties. Most obviously, the plaintiffs insisted from the beginning that all plaintiffs in the *Allen* and *Trammell* cases were properly joined and should proceed together. There is no indication that the plaintiffs sought to backtrack from that choice when they requested the CMO. Rather, the plaintiffs advertised that their proposed sequencing would "provide additional efficiencies," including "coordinated motion practice on issues present in all of the cases." Indeed, they pointed out that certain "threshold legal issues" would "of course … apply to all cases," and they urged that these common issues "be dealt with once, not on a case-by-case basis."

In sum, we cannot conclude that either party thought a severance had occurred under these circumstances.[8] Nor can

---

[8] At oral argument, the plaintiffs directed our attention to several documents in which the defendants insisted that issue preclusion should not apply in these cases. The plaintiffs also noted that the district court had earlier denied Atlantic Richfield's motion for summary judgment based on issue preclusion, in part because "the parties' evidentiary treatment of the issues is likely to become more focused and thorough with reiteration." These documents speak to issue preclusion, not law of the case. They may have everything to do with the Group 4 plaintiffs, but they have nothing to do with the Group 3 plaintiffs. We do not consider them here.

we say that the district court intended to sever the claims. The law of the case doctrine therefore properly applies. The plaintiffs may not seek relief from the consequences of streamlined litigation that they themselves initiated, promoted, and defended.

The law of the case doctrine exceptions do not save the plaintiffs. Their "new" lead dust evidence does not satisfy the "new evidence" exception because that exception applies only when the proposed new evidence was "previously undiscoverable." *See United States v. Sumner*, 325 F.3d 884, 891 (7th Cir. 2003); *Vidimos, Inc. v. Wysong Laser Co.*, 179 F.3d 1063, 1065 (7th Cir. 1999) (evidence must be new "and heretofore undiscoverable" to trigger the exception); *Aquinnah/Gay Head Cmty. Ass'n, Inc. v. Wampanoag Tribe of Gay Head (Aquinnah)*, 989 F.3d 72, 86 (1st Cir. 2021) ("A party may avoid the application of the law of the case doctrine only by showing that … significant new evidence, not earlier obtainable in the exercise of due diligence, has come to light …." (quotation marks omitted)). The plaintiffs readily concede that their new evidence has been available from the get-go, so it cannot provide grounds for relief.

The plaintiffs' contention that our decision in *Burton II* constitutes an "intervening change in the law" also fails. *Kathrein*, 752 F.3d at 685. As we have already explained, *Burton II* worked no change in the controlling law.

We therefore conclude that the Wave 2 and Group 3 plaintiffs are part of the same case for law of the case purposes, and no exception to that doctrine applies. The district court did not abuse its discretion in applying the law of the case to Group 3.

\*       \*       \*

The impact of our conclusion on the scope of this litigation is not lost on us. Affirming the district court's grant of summary judgment against Group 3 calves a considerable chunk from a once-sizeable mass of plaintiffs. Indeed, after all is said and done in this appeal, just three plaintiffs will remain.

That consequence is unavoidable given the *Allen* and *Trammell* plaintiffs' choice to proceed under just two complaints. In making that choice, the Wave 2 and Group 3 plaintiffs entered an all-for-one, one-for-all arrangement on common issues, and at all times remained tethered under their jointly filed complaints.

No doubt an earnest interest in efficiency motivated the plaintiffs' decision to proceed in this manner. A litigant's shortcuts, however, can cut both ways. When plaintiffs join together under one complaint, they opt for trial convenience and the expeditious determination of all disputes over the chance to litigate all questions on an individual basis. *See Bell*, 982 F.3d at 489; 7 Wright & Miller, *supra*, at § 1652. Perhaps for this reason, many courts have disfavored multi-party joinder in products liability cases. *See, e.g.*, *In re Accutane Prods. Liab. Litig. MDL No. 1626*, 2012 WL 4513339, at \*1 (M.D. Fla. 2012) ("Many federal courts hold that products liability cases are generally inappropriate for multi-plaintiff joinder because such cases involve highly individualized facts."); *see also* 12 Sheila L. Birnbaum *et al.*, Business and Commercial Litigation in Federal Courts § 128:4 (5th ed. Nov. 2022 Update) ("[W]here individual parties' claims involve separate underlying events, such as where two or more unrelated plaintiffs each alleges that she experienced an injury after using the same product, or similar products made by different

defendants, joinder of those parties and claims into a single action may not be appropriate because the facts giving rise to each plaintiff's claims will be different."). This is not to say that joinder was in any way improper here. Rather, we simply stress that the exceptions to the law of the case doctrine do not offer an out from that tactical gamble. *Cf. Burley v. Gagacki*, 834 F.3d 606, 619 (6th Cir. 2016) (plaintiffs' "strategic decision" not to contest an issue "precluded plaintiffs from making it an issue during subsequent proceedings"). There is nothing unreasonable about holding Group 3 to what it signed up for but now wishes it had not.

### C. Group 4 Plaintiffs

We turn next to the Group 4 plaintiffs. These plaintiffs—Ernest Gibson, Deziree Valoe, and Detareion Valoe—were not parties to the *Allen* and *Trammell* actions, either as members of Wave 2 or Group 3. They instead filed their own cases, which, pursuant to the case management order, the district court stayed pending the earlier waves of trials. The Group 4 plaintiffs now seek to litigate for themselves whether the defendants had a duty to warn under a lead dust-based theory of liability. The district court denied them that opportunity, instead granting summary judgment against them on issue preclusion grounds. After careful consideration, we reverse.

Issue preclusion, or collateral estoppel, "bars 'successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment,' even if the issue recurs in the context of a different claim." *Taylor v. Sturgell*, 553 U.S. 880, 892 (2008) (quoting *New Hampshire v. Maine*, 532 U.S. 742, 748 (2001)). Federal common law governs the preclusive effect of a federal court judgment. *Id.* at 891. In diversity cases like this one, "federal law

incorporates the rules of preclusion applied by the State in which the rendering court sits." *Id.* at 891 n.4 (citing *Semtek Int'l Inc. v. Lockheed Martin Corp.*, 531 U.S. 497, 508 (2001)).

Under Wisconsin law, "[o]nce an issue is actually and necessarily determined by a court of competent jurisdiction, that determination is conclusive in subsequent suits based on a different cause of action involving a party to the prior litigation." *Paige K.B. ex rel. Peterson v. Steven G.B.*, 594 N.W.2d 370, 374 (Wis. 1999) (quoting *Montana v. United States*, 440 U.S. 147, 153 (1979)). Where, as here, a party seeks to preclude a nonparty, Wisconsin courts apply a two-step analysis. "The threshold issue is whether [the] litigant [to be precluded] was in privity or had sufficient identity of interests to comport with due process." *Id.* at 377 (internal alterations omitted) (quoting *Ambrose v. Cont'l Ins. Co.*, 560 N.W.2d 309, 314 (Wis. 1997)). If so, the court asks whether applying issue preclusion would be fundamentally fair. *Id.*

The question before us is thus whether the Group 4 plaintiffs were in privity or had sufficient identity of interests with the Wave 2 plaintiffs such that applying issue preclusion against them comports with due process. "Due process requires that the litigant had sufficient opportunity to be heard." *Id.* (citing *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 327 n.7 (1979)). As a general matter, nonparties have not had a "full and fair opportunity to litigate" their claims, and so applying issue preclusion against them "runs up against the 'deep-rooted historic tradition that everyone should have his own day in court.'" *Taylor*, 553 U.S. at 892–93 (quoting *Richards v. Jefferson County*, 517 U.S. 793, 798 (1996)). It is therefore "a violation of due process for a judgment to be binding on a litigant who was not a party or a privy and therefore has never

had an opportunity to be heard." *In re Paternity of Mayonia M.M.*, 551 N.W.2d 31, 35 (Wis. Ct. App. 1996) (quoting *Parklane Hosiery*, 439 U.S. at 327 n.7).

"Privity exists when a person is so identified in interest with a party to former litigation that he or she represents precisely the same legal right with respect to the subject matter involved." *Pasko v. City of Milwaukee*, 643 N.W.2d 72, 78 (Wis. 2002). When the nonparty is not "so closely aligned with a party in the prior proceeding as to represent the same legal interest or the litigant's interests cannot be deemed to have been litigated in the prior proceeding, the litigant's due process rights would, as a matter of law, be violated were a court to apply issue preclusion." *Paige*, 594 N.W.2d at 378.

Our task sitting in diversity is to "use our own best judgment to estimate how the Wisconsin Supreme Court would rule as to its law." *Valerio v. Home Ins. Co.*, 80 F.3d 226, 228 (7th Cir. 1996); *see also In re Zimmer, NexGen Knee Implant Prods. Liab. Litig.*, 884 F.3d 746, 751 (7th Cir. 2018) ("When interpreting state law, a federal court's task is to determine how the state's highest court would rule." (quoting *Rodas v. Seidlin*, 656 F.3d 610, 626 (7th Cir. 2011)). Yet Wisconsin caselaw offers little guidance on how its preclusion rules operate in coordinated personal-injury actions. The district court largely based its holding on a single case from the Wisconsin Court of Appeals, *Jensen v. Milwaukee Mutual Insurance Co.*, 554 N.W.2d 232 (Wis. Ct. App. 1996), but the *Jensen* court did not meaningfully discuss the privity requirement or due process at all.

There are also significant factual differences between that case and this one. *Jensen* concerned the propriety of applying issue preclusion across subsequent negligence actions brought by a husband and wife against an insurance

company following a single car accident. 554 N.W.3d at 233–34. This case, however, involves several coordinated cases in which the plaintiffs are unrelated and their injuries do not stem from a single incident. And unlike in *Jensen*, where the wife "actively participated" in her husband's action as a "critical witness," *id.* at 235, the Group 4 plaintiffs here played no similar part in the prior proceedings. At best, they agreed to be bound by the court's rulings in prior cases. But *Jensen* offers no direction on how and when consent might support the application of issue preclusion against a nonparty. In other words, *Jensen* is both analytically meager and factually distinguishable. We are disinclined to import its holding here.

Because *Jensen* does not inform the outcome of this case, we look to the Supreme Court's decision in *Taylor v. Sturgell*, 553 U.S. 880. *See In re Zimmer*, 885 F.3d at 751 ("Absent any authority from the relevant state courts, the federal court shall examine the reasoning of courts in other jurisdictions addressing the same issue and applying their own law for whatever guidance about the probable direction of state law they may provide.'" (cleaned up)). *Taylor*, of course, arose under federal common law and is only persuasive here. *See* 553 U.S. at 893 n.6; *In re Zimmer*, 884 F.3d at 751. That said, there are good reasons to think the Wisconsin Supreme Court would follow *Taylor*—including that the court recently embraced that decision while applying its own state preclusion rules.[9] *See Clarke v. Wis. Elections Comm'n*, 998 N.W.2d 370, 392 n.23 (Wis. 2023). In our view, the state supreme court's approval of *Taylor* (and our reliance on it here) makes sense given the

---

[9] We find no Wisconsin authority in the fifteen years since *Taylor* suggesting that Wisconsin state courts disapprove that decision.

congruence between Wisconsin's preclusion law and that of the federal common law. The essential inquiry under both is whether precluding the nonparty violates his or her due process rights. *Compare Paige*, 594 N.W.2d at 377 ("The threshold issue is whether such a litigant was in privity or had sufficient identity of interests to comport with due process." (cleaned up)), *and In re Estate of Rille ex rel. Rille*, 728 N.W.2d 693, 707 (Wis. 2007) ("[Issue preclusion] is 'bottomed in guarantees of due process which require that a person must have had a fair opportunity procedurally, substantively, and evidentially to pursue the claim before a second litigation will be precluded.'" (quoting *Precision Erecting, Inc. v. M & I Marshall & Ilsley Bank*, 592 N.W.2d 5, 12 (Wis. Ct. App. 1998)), *with Taylor*, 553 U.S. at 891 ("The federal common law of preclusion is, of course, subject to due process limitations." (citing *Richards*, 517 U.S. at 797)). As the Wisconsin Supreme Court has said, "[t]he due process clauses of the United States *and* Wisconsin Constitutions 'prohibit a court from granting preclusive effect to a prior determination of an issue without the precluded party having had the opportunity to contest that issue.'" *Paige*, 594 N.W.2d at 378 (emphasis added) (quoting *Parker v. Williams*, 862 F.2d 1471, 1474 n.1 (11th Cir. 1989)). Thus, while *Taylor* reflects the federal common law approach to issue preclusion, the close parallels between that approach and that of Wisconsin state law lead us to predict that the Wisconsin Supreme Court would look to *Taylor* in answering the question presented here.

*Taylor* is a particularly appropriate lodestar because it is the Court's most recent thorough exploration of nonparty issue preclusion. The question there concerned whether a court could bind nonparties under a theory of "virtual representation" based on an "identity of interests and some kind of

relationship between parties and nonparties." *Taylor*, 553 U.S. at 901. The Supreme Court unanimously rejected that theory, explaining:

> An expansive doctrine of virtual representation … would "recogniz[e], in effect, a common-law kind of class action." That is, virtual representation would authorize preclusion based on identity of interests and some kind of relationship between parties and nonparties, shorn of the procedural protections prescribed in [Supreme Court precedent] and Rule 23. These protections, grounded in due process, could be circumvented were we to approve a virtual representation doctrine that allowed courts to "create *de facto* class actions at will."

*Id.* at 901 (quoting *Tice v. Am. Airlines, Inc.*, 162 F.3d 966, 972–73 (7th Cir. 1998)). Recognizing the "fundamental nature" of the general rule against nonparty preclusion, the Court observed that it had "endeavored to delineate discrete exceptions that apply in 'limited circumstances'": (1) nonparty agreement to be bound in a prior action; (2) nonparty control over the prior action; (3) adequate representation of the nonparty by the party to the judgment in the prior action; (4) a substantive legal relationship between the party to the judgment in the prior action and the nonparty; (5) relitigation of the prior action through a proxy; and (6) the existence of a special statutory scheme providing for nonparty issue preclusion.[10] *Id.* at 893–95, 898 (quoting *Richards*, 517 U.S. at 762 n.2).

---

[10] The Court stressed, however, that its list of exceptions did "not … establish a definitive taxonomy" and was "meant only to provide a

The virtual representation doctrine did not fit within any of these exceptions, and the Court objected to abandoning them in favor of an "amorphous balancing test" that would be "at odds with the constrained approach to nonparty preclusion [its] decisions advance." *Id.* at 898.

*Taylor* supplies a helpful framework for our analysis. As the Court did there, we ask whether applying issue preclusion to Group 4 fits within any of the recognized categories of exceptions to the general rule against nonparty issue preclusion. Three are clearly inapplicable to the facts here: there is no substantive legal relationship between the Group 4 and Wave 2 plaintiffs, the Wave 2 plaintiffs are not simply relitigating their claims through Group 4, and there is no statute at issue purporting to permit preclusion. The remaining three categories of exceptions—nonparty agreement to be bound, control, and adequate representation—require some discussion. We take each in turn.

### 1. Agreement to be Bound

Nonparties may freely choose to forgo their day in court. As the Supreme Court has said, "[a] person who agrees to be bound by the determination of issues in an action between others is bound in accordance with the terms of his agreement." *Taylor*, 553 U.S. at 893 (alteration in original) (quoting 1 Restatement (Second) of Judgments § 40 (1980)). "Agreement" in this context can be either explicit or implicit. *Id.* at 894 n.7 (citations omitted).

---

framework for [its] consideration of virtual representation." *Taylor*, 553 U.S. at 893 n.6.

The paradigmatic example of nonparty issue preclusion by consent appears in multiparty disputes. "[I]f separate actions involving the same transaction are brought by different plaintiffs against the same defendant, all the parties to all the actions may agree that the question of the defendant's liability will be definitely determined, one way or the other, in a 'test case.'" *Id.* at 893 (quoting David Shapiro, Civil Procedure: Preclusion in Civil Actions 77–78 (2001)).

Here, there is no evidence the Group 4 plaintiffs explicitly agreed to be bound by the district court's duty-to-warn determination in the Wave 2 cases. While the defendants rely on the CMO as showing the Group 4 plaintiffs' consent, that reliance is misplaced. Neither the plaintiffs' motion nor the CMO mentioned preclusion.

The CMO also does not support the conclusion that the Group 4 plaintiffs impliedly consented to be bound. As a general matter, courts are reluctant to find implied consent to nonparty issue preclusion, given the due process guarantees at stake. *See generally* 18A Wright & Miller, *supra*, at § 4453 ("Great care should be taken, however, to ensure that the circumstances actually warrant the implication that there was in fact an agreement to be bound. For the most part, implied consent is not found."); Shapiro, *supra*, at 78 (cautioning that "courts should be hesitant to rely on notions of 'implied consent'"); Restatement (Second) of Judgments § 40 (1982) ("While a party may agree to refrain from exercising his right to a day in court in return for being spared the burden of active litigation, no such agreement should be inferred except upon the plainest circumstances."). The uncertainty surrounding the preclusive scope of the CMO gives us no reason to shed that reluctance.

The defendants point out that the plaintiffs acknowledged that certain threshold "legal issues" applicable to all cases should be dealt with once, and that the existence of a duty to warn is one such common question of law. Yet answering that question involves applying law to fact. *See Strasser v. Transtech Mobile Fleet Serv., Inc.*, 613 N.W.2d 142, 154 (Wis. 2000) ("Where the parties agree upon the facts, the existence of a duty presents a question of law."). It would be one thing to hold Group 4 to the court's determination of how that duty is defined in negligence cases. It is entirely another to deny them the chance to present their own evidence showing that such a duty existed. Absent clear evidence to the contrary, we are skeptical that Group 4 intended the CMO as a wholesale surrender-by-implication of their due process rights to litigate dispositive factual issues, for themselves, in their own cases.

That conclusion is consistent with the widely accepted principle that bellwether trials in separate, aggregated cases are typically non-binding. *See In re E.I. du Pont de Nemours & Co. C-8 Personal Injury Litig.*, 54 F.4th 912, 938 (6th Cir. 2022) (Batchelder, J., concurring in part and dissenting in part) ("In practice, [bellwether] results are generally non-binding absent an agreement to the contrary between the parties." (citing Eldon E. Fallon *et al.*, *Bellwether Trials in Multidistrict Litigation*, 82 Tul. L. Rev. 2323, 2331 n.27, 2337 (2008)). While parties may occasionally consent to be bound by the results of a single bellwether, *see, e.g.*, *Silivanch v. Celebrity Cruises, Inc.*, 333 F.3d 355, 359 (2d Cir. 2003), the plaintiffs' descriptions of the Wave 2 trials confirm that no such thing happened here. The plaintiffs repeatedly described the Wave 2 trials as *informing* future litigation—not foreclosing future claims. For example, the plaintiffs' motion for a case management order insisted that "[o]nce these bellwether trials [were] complete, all parties

would have a good handle on how to resolve any remaining issues, and be able to formulate a game plan for the remainder of the cases." Later on, the plaintiffs described the district court's findings in prior waves as merely "precedent" that would help inform disputed issues, not bind the parties.

Importantly, the vitality of the day-in-court ideal does not diminish in consolidated, multi-party litigation. As the Third Circuit observed in another mass tort case, consolidation "does not merge the suits into a single cause, or change the rights of the parties, or make those who are parties in one suit parties in another." *In re TMI Litig.*, 193 F.3d 613, 724 (3d Cir. 1999). There, the court found issue preclusion improper among consolidated cases, even where the parties had agreed to conduct evidentiary and discovery matters on an "[a]ll [p]laintiffs" basis, and even where the district court's ruling "turn[ed] on broad evidentiary issues common to all Plaintiffs." *Id.* at 628, 723. Notwithstanding those coordinated proceedings and the common issues, the court found that applying issue preclusion would "improperly extend the doctrine" beyond its due process bounds. *Id.* at 726.

We think Wisconsin courts would share the hesitation to find privity and preclude a nonparty from litigating an application of law to fact without some clear indication that the nonparty intended that result. That reluctance is particularly prudent in the complex and plaintiff-rich environment of mass-tort litigation, where the temptation to strike many birds with one stone is understandably strong. *Cf. Malcolm v. Nat'l Gypsum Co.*, 995 F.2d 346, 350 (2d Cir. 1993) ("The systemic urge to aggregate litigation must not be allowed to trump our dedication to individual justice, and we must take care that each individual plaintiff's—and defendant's—cause

not be lost in the shadow of a towering mass litigation." (quoting *In re Brooklyn Navy Yard Asbestos Litig.*, 971 F.2d 831, 853 (2d Cir. 1992)). Even among tightly coordinated cases, "separate cases brought together for pretrial proceedings 'retain their separate identities.'" *Home Depot USA, Inc. v. Lafarge N. Am., Inc.*, 59 F.4th 55, 62 (3d Cir. 2023) (quoting *Gelboim v. Bank of Am. Corp.*, 574 U.S. 405, 413 (2015)). Consolidation alone cannot "impose the heavy toll of a diminution of any party's rights." *Id.* (quoting *Bradgate Assocs., Inc. v. Fellows, Read & Assocs.*, 999 F.2d 745, 750 (3d Cir. 1993)). We therefore find insufficient evidence that Group 4, in the CMO or elsewhere, consented to be bound in the prior proceedings.

### 2. Control

The next category of exception to the general rule against nonparty preclusion is control. "[A] nonparty is bound by a judgment if she 'assume[d] control' over the litigation in which that judgment was rendered.'" *Taylor*, 553 U.S. at 895 (quoting *Montana*, 440 U.S. at 154); *see also State v. Mechtel*, 499 N.W.2d 662, 667 (Wis. 1993) ("For a nonparty to an action to be in privity with a party, the nonparty must substantially control or be represented by the party."). Where a nonparty's vicarious presence in a case amounts to an exercise of control over a named party, "then the nonparty effectively enjoyed his day in court, and it is appropriate to impute to him the legal attributes of party status for [preclusion] purposes." *Gonzalez v. Banco Cent. Corp.*, 27 F.3d 751, 758 (1st Cir. 1994).

"Control" in this context carries its ordinary meaning and should not be confused with mere coordination or an alignment of interests. "[T]he degree of control justifying preclusion of a nonparty should be enough that the nonparty has the actual measure of control or opportunity to control that

might reasonably be expected between two formal coparties." *Kerr-McGee Chem. Corp. v. Hartigan*, 816 F.2d 1177, 1181 (7th Cir. 1987) (cleaned up); *see also Mechtel*, 499 N.W.2d at 667 (finding no evidence that the state controlled a federal prosecution where "[t]he state and federal prosecutors did cooperate to some degree when the state decided to dismiss the firearms charges in order to allow the firearms charges to be federally prosecuted"); Restatement (Second) of Judgments § 39 (1982) ("To have control of litigation requires that a person have effective choice as to the legal theories and proofs to be advanced in behalf of the party to the action. He must also have control over the opportunity to obtain review."). A mere tightly coordinated litigation strategy between the parties is insufficient. *See E.E.O.C. v. Pemco Aeroplex, Inc.*, 383 F.3d 1280, 1290 (11th Cir. 2004); 18A Wright & Miller, *supra*, at § 4451 ("[I]t is not enough that the nonparty … participated in consolidated pretrial proceedings").

We find no evidence of control in this case. While the district court found that "the plaintiffs were prosecuting claims against the same defendants under identical legal theories in front of the same court and the same judge, who had been managing all cases jointly," its focus on those similarities says nothing about the degree of Group 4's control over the Wave 2 proceedings.

The only possible evidence of control is the parties' shared counsel. It is well established, however, that shared counsel alone does not amount to control and cannot alone justify preclusion of a nonparty. *See, e.g., Clarke*, 998 N.W.2d at 392 n.23 ("[T]he identity of the lawyers hired by [the nonparty] is irrelevant to whether the [nonparty's] due process rights were protected." (citing *Taylor*, 553 U.S. at 892–93)); *Gonzalez*, 27

F.3d at 759 ("[C]ourts have refused to find substantial control merely because a nonparty retained the attorney who represented a party to the earlier action."); *Collins v. E.I. DuPont de Nemours & Co.*, 34 F.3d 172, 178–79 (3d Cir. 1994) ("The fact that the plaintiff's attorney took part in a prior, similar action is irrelevant unless there is evidence that the plaintiff was, through his or her attorney, actually participating in the prior suit."); *Benson & Ford, Inc. v. Wanda Petroleum Co.*, 833 F.2d 1172, 1175 (5th Cir. 1987) ("For a nonparty to be so closely aligned … requires more than a showing of parallel interest or, even, a use of the same attorney in both suits.") (quotation marks omitted). The Group 4 plaintiffs thus did not control the earlier litigation for purposes of issue preclusion.

### 3. Adequate Representation

Under the final *Taylor* category, "a nonparty may be bound by a judgment because she was 'adequately represented by someone with the same interest who [was] a party' to the suit." *Taylor*, 553 U.S. at 894 (quoting *Richards*, 517 U.S. at 798). "A party's representation of a nonparty is 'adequate' for preclusion purposes only if, at a minimum: (1) The interests of the nonparty and her representative are aligned; and (2) either the party understood herself to be acting in a representative capacity or the original court took care to protect the interests of the nonparty." *Id.* at 900 (first citing *Hansberry v. Lee*, 311 U.S. 32, 43 (1940), and then citing *Richards*, 517 U.S. at 801–02). Where the second prong goes unsatisfied, the due process inquiry "c[omes] to an end." *Id.* at 897–98.

In this case, there is no evidence satisfying either element of the second prong. The Wave 2 plaintiffs "did not sue on behalf of a class," their complaint "did not purport to assert any claim against or on behalf of any nonparties," and the

court's summary judgment ruling "did not purport to bind" nonparties. *Richards*, 517 U.S. at 801. There is also no indication that the court "took care to protect the interests" of the Group 4 plaintiffs, or that the Wave 2 plaintiffs "understood their suit to be on behalf of absent [parties]." *Id.* at 802. Under these circumstances, the prior plaintiffs did not adequately represent the Group 4 plaintiffs, and issue preclusion would be "inconsistent with 'the due process of law guaranteed by the Fourteenth Amendment.'" *Taylor*, 553 U.S. at 896–97 (quoting *Richards*, 517 U.S. at 797).

*        *        *

The application of issue preclusion against the Group 4 plaintiffs thus does not fit within any of *Taylor*'s exceptions to the general rule against nonparty issue preclusion. While that conclusion is not determinative, it does aid us in locating the due process limitations that shape Wisconsin's preclusion test. Indeed, we find no Wisconsin authority since *Taylor* suggesting that Wisconsin's courts embrace a more expansive approach to issue preclusion than that of the federal common law. There is therefore good reason to think that given the opportunity, the Wisconsin Supreme Court would take an equally dim view of a brand of issue preclusion falling outside of *Taylor*'s recognized exceptions. *Cf. id.* at 904 ("The preclusive effects of a judgment in a federal-question case decided by a federal court should … be determined according to the established grounds for nonparty preclusion described in this opinion."); *Duckett v. Fuller*, 819 F.3d 740, 745 (4th Cir. 2016) ("[T]he resolution of the issue presented in this appeal begins and ends with *Taylor*."); *Briscoe v. City of New Haven*, 654 F.3d 200, 203–04 (2d Cir. 2011) ("consult[ing] the[] six categories" in *Taylor* and finding issue preclusion improper).

Accordingly, we conclude that the Group 4 plaintiffs were not in privity and lacked sufficient identity of interest with the plaintiffs in the prior proceedings. Group 4 has thus far sat largely on the sidelines of this litigation, a position that has deprived them of the "full and fair opportunity to litigate" the duty question. *Taylor*, 553 U.S. at 892; *Paige*, 594 N.W.2d at 377–78. "Principles of issue preclusion have not developed to the point where we may bind plaintiffs by the finding of previous proceedings in which they were not parties"—even by proceedings as coordinated as those that the case management order called for here. *See In re TMI*, 193 F.3d at 726 (quoting *DeLuca v. Merrell Dow Pharm., Inc.*, 911 F.2d 941, 952 (3d Cir. 1990)). Because the Group 4 plaintiffs were not in privity nor had sufficient identity of interest with the prior plaintiffs, "applying issue preclusion to the[m] would violate [their] due process rights and the analysis ends." *Paige*, 594 N.W.2d at 377.

Undeterred, the defendants insist that Group 4 was on notice that issue preclusion would apply to their cases because the court used issue preclusion to dismiss American Cyanamid after finding that it lacked personal jurisdiction in the Wave 1 trials. The defendants offer no case in which a court has recognized a notice-based theory of issue preclusion. And even assuming mere notice could cure our due process concerns, it would not do so here because no such notice existed. While the court may have used issue preclusion to dismiss American Cyanamid, it declined to apply issue preclusion to the jury's liability finding as to Atlantic Richfield, explaining that the appropriateness of preclusion depended on the circumstances. Indeed, Sherwin Williams itself opposed Atlantic Richfield's attempt to apply issue preclusion, asserting that "Plaintiffs may wish to investigate and present their own …

evidence … that was not presented or developed fully in the first-round trial." The court's earlier rulings thus did not provide the plaintiffs with meaningful notice and cannot support its application of issue preclusion here.[11]

Finally, although we disagree with the district court's application of issue preclusion under the circumstances here, we recognize the inherent challenges that complex multiparty cases pose for district courts. Courts in these circumstances face the difficult task of balancing litigants' due process rights against the practical demands of shepherding hundreds of individual claims toward final resolution. Laudably, judges "have risen to this challenge by devising efficient, effective, and fair case management techniques." *Home Depot*, 59 F.4th at 65. This case is no different, and we again commend the court's able stewardship of this litigation.

But it is important that the efficient pursuit of finality not lose sight of the day-in-court guarantee and the due process protections available to all parties. *See Malcolm*, 995 F.2d at 350 ("The benefits of efficiency can never be purchased at the cost of fairness."). To that end, courts and commentators have identified several tools at a district court's disposal that promote the efficient and final resolution of complex cases, yet safeguard litigants' procedural interests in being heard. *See, e.g.*, *Home Depot*, 59 F.4th at 65–68. These include, for example,

---

[11] The defendants alternatively argue that law of the case separately warrants judgment in their favor. Not so. As we have already explained, law of the case operates "within a single action." *Currier v. Virginia*, 138 S. Ct. 2144, 2154 (2018). *But see Disimone v. Browner*, 121 F.3d 1262, 1266–67 (9th Cir. 1997). Even if it did not, the due process concerns we have already identified persuade us against applying that discretionary doctrine here.

treating prior decisions as persuasive absent a showing of cause why the issue should be revisited, or requiring consolidated complaints. *Id.* Nothing in this opinion should be taken to discourage such devices, or other procedural innovation consistent with due process, going forward.

### 4. The Plaintiffs' New Evidence

The defendants also ask us to consider the merits of the duty-to-warn question based on the new lead dust evidence. "[F]actfinding is the basic responsibility of district courts, rather than appellate courts." *Pullman-Standard v. Swint*, 456 U.S. 273, 291–92 (1982) (quoting *DeMarco v. United States*, 415 U.S. 449, 450 (1974)). It is not our role to leapfrog the district court and "resolve[] in the first instance [a] factual dispute which ha[s] not been considered by the District Court." *Id.*; *Door Sys., Inc. v. Pro-Line Door Sys., Inc.*, 126 F.3d 1028, 1032 (7th Cir. 1997) ("It remains to apply the standard to the facts, but that is a job in the first instance for the district court."). We leave this task to the district court on remand.

### D. Revisiting *Burton II*

The plaintiffs close with a parting shot at *Burton II*. Specifically, they take aim at two of our conclusions of state law there: first, that the duty to warn in both the negligence and strict liability contexts depends on the knowledge of the ultimate consumer; and second, that there can be no negligence liability without a product defect. *See Burton II*, 994 F.3d at 817–23. The plaintiffs assert that each of these conclusions was contrary to Wisconsin law, and they move to certify the issues to the Wisconsin Supreme Court for resolution. In the

alternative, the plaintiffs ask us to overrule *Burton II*.[12] We reject both invitations.

Precedents may not be "sacrosanct," but neither are they fickle. *Buchmeier v. United States*, 581 F.3d 561, 565 (7th Cir. 2009) (en banc). "There must be a serious justification for overruling a settled precedent." *United States v. Ramirez*, 52 F.4th 705, 712 (7th Cir. 2022). "We do not lightly overturn circuit precedent, and we give 'considerable weight to prior decisions of this court unless and until they have been overruled or undermined by the decisions of a higher court, or other supervening developments.'" *Wesbrook v. Ulrich*, 840 F.3d 388, 399 (7th Cir. 2016) (quoting *Santos v. United States*, 461 F.3d 886, 891 (7th Cir. 2006), *aff'd*, 553 U.S. 507 (2008)).

The inertia of circuit precedent is particularly strong when the prior decision answered a question of state law. As we said in *Burton II*, when the court invests the time and resources to weigh in on an unsettled issue of state law, "our conclusion binds us until the state's supreme court says otherwise." *Burton II*, 994 F.3d at 815–16 (citing *Reiser v. Residential Funding Corp.*, 380 F.3d 1027, 1029–30 (7th Cir. 2004)); *see*

---

[12] The plaintiffs also "suggest[ed]," but never petitioned for, an initial en banc hearing to address our ruling in *Burton II*. *See* Fed. R. App. P. 35. Wisely so, in our view. It bears repeating that the standards for granting rehearings en banc (and initial en banc hearings, for that matter) are "strict" in this circuit. *HM Holdings, Inc. v. Rankin*, 72 F.3d 562, 562 (7th Cir. 1995). The bar is even higher for petitions presenting only issues of state law. Such petitions have "an added burden to explain why [a state law issue is] of such exceptional importance that it warrant[s] review en banc in a federal court, the decision of which would not even be binding on [state] courts." *Id.* at 563. The plaintiffs here make no case why the issues in *Burton II* rise to that level.

*also Wesbrook*, 840 F.3d at 399 ("The state courts are quite capable of signaling when they disagree with a federal court's interpretation of state law."). The Wisconsin courts have not said otherwise in this instance. The plaintiffs point to no state court case since *Burton II* disapproving or even distinguishing our decision there. Not for lack of opportunity, either—a year after our decision in *Burton II*, the plaintiffs asked the Wisconsin Supreme Court to take jurisdiction of an original action addressing these same questions, and the state court declined review. *See* Wis. Stat. § 809.70 (2021). Moreover, the cases we relied on in *Burton II* remain good law. *See, e.g., Godoy ex rel Gramling v. E.I. du Pont de Nemours & Co.*, 768 N.W.2d 674 (Wis. 2009); *Morden v. Cont'l AG*, 611 N.W. 2d 659 (Wis. 2000); *Greiten v. LaDow*, 235 N.W.2d 677 (Wis. 1975) (controlling opinion of Heffernan, J.). The plaintiffs' challenges to *Burton II* on this appeal are identical to those we rejected in *Burton II*, and nothing since then has called that decision into question. Absent any indication that the Wisconsin state courts take issue with *Burton II*, "the principle of stare decisis controls." *Wesbrook*, 840 F.3d at 399.

Certification to the Wisconsin Supreme Court is also inappropriate. For starters, we are far from "uncertain" about what Wisconsin law has to say about these questions because we answered them at length in *Burton II*. *See State Farm Mut. Auto. Ins. Co. v. Pate*, 275 F.3d 666, 673 (7th Cir. 2001). As a prudential matter, sending to the state court questions we have already answered renders our earlier effort a waste—especially without signs from the state court that we got *Burton*

*II* wrong.[13] *See Nat'l Cycle, Inc. v. Savoy Reinsurance Co.*, 938 F.2d 61, 64 (7th Cir. 1991) ("[T]he right time to certify a question is before the first federal decision on the point. Certification eliminates the need to expend judicial resources predicting how another court will decide a question. Once we have invested the time and effort to make the prediction, the costs have been sunk."); *see also Hernandez v. Ill. Inst. of Tech.*, 63 F.4th 661, 673 (7th Cir. 2023) (Kirsch, J., concurring). Finally, the Wisconsin Supreme Court already declined to address the issues in *Burton II* when it denied the plaintiffs' petition for original action. *See Circle Block Partners, LLC v. Fireman's Fund Ins. Co.*, 44 F.4th 1014, 1024 (7th Cir. 2022) (declining to certify questions in part because "[t]he Indiana Supreme Court recently decided not to address those issues" (citations omitted)). We therefore decline to certify the issue to the Wisconsin Supreme Court.[14]

### III. Conclusion

For these reasons, we affirm the judgments of the district court as to the Wave 2 and Group 3 plaintiffs. We reverse the judgment as to Group 4, and remand to the district court for further proceedings consistent with our opinion.

---

[13] Indeed, we declined a motion to certify nearly identical questions after *Burton II*.

[14] In light of this decision, the defendants' motion to strike the plaintiffs' certification motion is denied as moot.